# UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|                                         |     |                    |
|-----------------------------------------|-----|--------------------|
| WILLIAM MARQUETTE,                      | :   |                    |
|                                         | :   |                    |
| Plaintiff                               | :   | No. 3:16-CV-0215   |
|                                         | :   |                    |
| vs.                                     | :   | (Judge Nealon)     |
|                                         | :   |                    |
| NANCY A. BERRYHILL,[1] Acting           | :   |                    |
| Commissioner of Social Security,        | :   |                    |
|                                         | :   |                    |
| Defendant                               | :   |                    |

## MEMORANDUM

On February 8, 2016, Plaintiff, William Marquette, filed this instant appeal[2] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration, ("SSA"), denying his application for Disability Insurance Benefits, ("DIB"), under Title II of the Social Security Act, 42 U.S.C.

---

1. Nancy A. Berryhill became the new Acting Commissioner of Social Security on January 23, 2017. See http://blog.ssa.gov/meet-our-new-acting-commissioner/. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for former Acting Commissioner, Carolyn W. Colvin, as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

2. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

§ 1461, et seq., and his application for Supplemental Security Income, ("SSI"),[3]

under Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq. (Doc. 1).

The parties have fully briefed the appeal. For the reasons set forth below, the

decision of the Commissioner denying Plaintiff's applications for DIB and SSI

will be affirmed.

## BACKGROUND

Plaintiff protectively filed[4] his applications for DIB and SSI on June 15,

2012, alleging disability beginning on January 1, 2010,[5] due to a combination of

back and neck pain, Depression, Bipolar Disorder, and Barrett's Disease. (Tr. 42,

65, 90, 72-73, 77-81).[6] These claims were initially denied by the Bureau of

Disability Determination ("BDD")[7] on October 19, 2012. (Tr. 42). On November

---

3. Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

4. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

5. This Court takes notice that Plaintiff's original alleged onset date was June 10, 2009, and that he amended his onset date at the hearing. (Tr. 42, 65).

6. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on May 4, 2016. (Doc. 8).

7. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social

8, 2012, Plaintiff filed a request for an oral hearing. (Tr. 42). On January 7, 2014, a hearing was held before administrative law judge Sharon Zanotto, ("ALJ"), at which Plaintiff and impartial vocational expert Andrew Caporale, ("VE"), testified. (Tr. 42). On April 14, 2014, the ALJ issued a decision denying Plaintiff's applications for DIB and SSI. (Tr. 42-51). On May 29, 2014, Plaintiff filed a request for review with the Appeals Council. (Tr. 36). On December 15, 2015, the Appeals Council denied Plaintiff's appeal, thus making the decision of the ALJ final. (Tr. 1-7).

Plaintiff filed the instant complaint on February 8, 2016. (Doc. 1). On May 4, 2016, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 7 and 8). Plaintiff filed a brief in support of his complaint on June 17, 2016. (Doc. 9). Defendant filed a brief in opposition on August 15, 2016. (Doc. 12). Plaintiff did not file a reply brief.

Plaintiff was born in the United States on June 25, 1977, and at all times relevant to this matter was considered a "younger individual."[8] (Tr. 261). Plaintiff

Security Administration.

8. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-

completed the eleventh grade in 1995, attended special education classes, and can communicate in English. (Tr. 263, 265). His employment records indicate that he previously worked as a broker for a trucking company. (Tr. 267).

In a document entitled "Function Report - Adult" filed with the SSA on July 12, 2012, Plaintiff indicated that he lived in a house with his boyfriend. (Tr. 278). He had some problems with personal care tasks such as dressing and using the toilet due to bleeding and mobility issues, did not prepare meals, and ironed and folded the laundry "not that often." (Tr. 280-282). He could walk about a block or so before needing to rest for a few minutes. (Tr. 286). When asked to check items which his "illnesses, injuries, or conditions affect," Plaintiff did <u>not</u> check reaching, talking, using hands or getting along with others. (Tr. 286).

Regarding concentration and memory, Plaintiff needed special reminders to take care of his personal needs, to go places, and to take his medicine. (Tr. 282, 284). With help, he could pay bills, use a checkbook, count change, and handle a savings account. (Tr. 283). He could pay attention for "not long," his ability to follow written instructions depended on the amount of detail, his ability to follow spoken instruction was "not to[o] good cause [he] forgot things pretty quick[ly],"

---

49 are more limited in their ability to adjust to other work than persons who have not attained age 45. <u>See</u> Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

4

he was not able to finish what he started, did not handle stress well, and had the same routine for "at least the last 6 months." (Tr. 286-287).

Socially, Plaintiff left the house for doctor's appointments and to go to shopping about once a month. (Tr. 283). He indicated that when he went out, he was able to do so alone "as long as [he was not] bleeding or in to[o] much pain," and was able to walk and sometimes drive a car. (Tr. 283). His hobbies included reading comic books, watching television, and spending time with his family and pets. (Tr. 284). He indicated he got along "fine" with others. (Tr. 288).

At his hearing on January 7, 2014, Plaintiff testified that he left his job at a trucking company because he was "having a lot of problems as far as with [his] back, [and his] health," such as "Barrett's with [his] intestinal tract" that would cause him to bleed and constant back pain. (Tr. 72-73). He indicated that his back pain was aggravated by "anything physical," that it worsened after surgery in 2009, and that he was in constant pain, whereas before the surgery, his pain was not entirely constant. (Tr. 77-81). He stated that medications gave him slight relief from the pain, and had the side effects of making him feel "goofy" and drowsy. (Tr. 84). He testified that radiofrequency ablations did not give him relief. (Tr. 88-89). Regarding the bleeding that occurred from Barrett's Disease, Plaintiff stated it occurred a "few times a year," lasted anywhere from a few hours

to two (2) days, and required a visit to the hospital. (Tr. 89). Regarding Depression, Plaintiff indicated that he reached a point where he felt like he was having a nervous breakdown "a lot"and that he was suicidal. (Tr. 90). Plaintiff testified that his typical day involved waking up at six o-clock in the morning (6:00 AM), sitting in a recliner and watching television with frequent change of positions, showering, eating once a day, and using the computer or phone. (Tr. 99-100). He indicated that he could stand for "maybe" twenty (20) minutes and could sit for up to one (1) hour, could walk for about fifty (50) yards, hard trouble reaching overhead, had difficulty hearing and using stairs, and could lift about ten (10) pounds. (Tr. 101-104).

**MEDICAL RECORDS**

     **A.**    **Medical Evidence**

          **1.**    **Argires, Becker and Westphal Brain, Orthopedic, Sports Medicine and Spine Care**

On March 15, 2010, Plaintiff had an appointment with Perry Argires, M.D., for low back pain. It was noted that Plaintiff was doing "well" following his cervical arthroplasty procedure, that he had undergone multiple conservative treatments for his back pain, and that, due to his increased symptomology, he was considering surgical options to fix the herniated disc and disc deterioration at the

L5-S1 level. (Tr. 558). His physical examination revealed: alertness and orientation; clear and fluent speech; 5/5 motor strength in the upper and lower extremities; diminished and symmetric reflexes throughout; and a steady gait. (Tr. 558). Dr. Argires recommended Plaintiff undergo an anterior discectomy with arthroplasty. (Tr. 559).

On June 18, 2010, Plaintiff had an appointment with Rienna Fulmer, PA-C, after he felt "something pop in the right side of his neck" when he lifted a basket of laundry onto the dryer that also caused pain in his scapula and over towards his deltoid with occasional radiation into the ulnar distribution of his fingers into his right hand. (Tr. 560). It was noted Plaintiff also had chronic back pain that was being "worked up." (Tr. 560). A physical examination revealed Plaintiff: was alert and oriented; had limited flexion and extension secondary to pain; had significant pain with rotation over the right side of the shoulder; had two small palpable areas of muscle spasm in the cervical spine and occipital region that were extremely tender to touch; had good strength with resistance of muscle testing in the biceps, triceps, and deltoid on the right side; and had exacerbation of symptoms throughout his exam in the area of the cubital tunnel and into his right fourth and fifth fingers. (Tr. 560). Plaintiff was diagnosed as having post cervical disc replacement with recent exacerbation and radiculitis. (Tr. 560). He was

referred to pain management, and Dr. Argires ordered a "myo block" to decrease inflammation in the cervical spine. (Tr. 560).

On July 1, 2010, Plaintiff had an appointment with Trevin Thyrman, M.D. for neck pain. (Tr. 562). A physical examination revealed: 5/5 strength in the bilateral upper and lower extremities; tight cervical paraspinals at the C5-C6 level with decreased rotation to the left; and negative Hoffmann's and Spurling's tests bilaterally. (Tr. 562). Plaintiff was diagnosed with cervical radiculitis. (Tr. 562). Dr. Thurman recommended epidural steroid injections to treat the acute onset of symptoms and a repeat cervical MRI if these injections failed. (Tr. 563).

On September 3, 2010, Plaintiff had an appointment with Dr. Argires for follow-up of the neck pain on the right side in the suboccipital area. (Tr. 566). Dr. Argires ordered a bone scan to assess Plaintiff's facet joints. (Tr. 566).

On October 5, 2010, Plaintiff had a follow-up appointment with Dr. Argires. (Tr. 567). Dr. Argires suggested Plaintiff undergo diagnostic facet blocks at C3-C4 and C4-C5 and a possible epidural steroid injection at the L5-S1 level. (Tr. 567).

On October 8, 2010, Plaintiff had a follow-up appointment with Dr. Thurman for persistent pain on the right side of his neck most notable in the middle of his right neck with some radiation down to the right shoulder that was

"somewhat improved after the epidural steroid injections." (Tr. 568). It was noted Plaintiff continued to have back pain "at the belt line" that was most significant on his right side and was accompanied by numbness and paresthesias, which radiated on the lateral aspect of his thigh and anterior aspect of his shin and foot on the right side. (Tr. 568). A physical examination revealed Plaintiff had: 5/5 strength bilaterally in the upper and lower extremities; a C4-C5 facet joint that was slightly tender to palpation; a C5-C6 facet joint that was moderately tender to palpation; and increased low back pain with lumbar flexion to sixty (60) degrees. (Tr. 568). The impression was that Plaintiff had right L5 radiculopathy with an annular tear at the L5-S1 disc and facet degeneration and pain at the right C4-C5 and C5-C6 facets. (Tr. 568). Dr. Thurman recommended lumbar epidural steroid injections for his lumbar pain and medial branch blocks for his neck pain follow by radiofrequency ablation. (Tr. 569).

On April 26, 2011, Plaintiff had a follow-up appointment with PA Fulmer for ongoing low back and right leg pain. (Tr. 601). Plaintiff reported his pain had gotten increasing worse over the last several weeks and that it was intractable and consistent. (Tr. 601). Plaintiff was assessed as having chronic low back pain and right leg radiculopathy. (Tr. 601). Plaintiff was given a corset brace for his back and PA Fulmer ordered a new MRI of his lumbosacral spine. (Tr. 601).

On May 5, 2011, Plaintiff had an appointment with Ogden Gorham, PA-C, after falling fourteen (14) to sixteen (16) feet from an upper stair landing at his home and landing on the top of his head a week prior. (Tr. 599). His physical examination revealed: a normal gait; grossly intact cranial nerves with no focal deficits; good strength of bilateral upper extremities; well-preserved range of motion in his neck; trapezius tenderness; posterior cervical tenderness from muscle spasm; and good positioning of his prestige cervical disc at C4-C5 with no evidence of malposition or migration and good preserved disc space at adjacent levels. (Tr. 599-600). PA Gorham recommended Plaintiff undergo an MRI of his brain. (Tr. 600).

On May 17, 2011, Plaintiff had an appointment with PA Fulmer for low back and right leg pain. (Tr. 597). It was noted that the injections Plaintiff had received had not provided significant relief and that his pain increased since April 2011. (Tr. 597). Plaintiff indicated that he was using a back brace given to him at his last visit with mild relief, and that he had trouble doing any type of activities, standing, or sitting for any long period of time. (Tr. 597). His physical examination revealed: alertness and orientation; pain over the right posterior buttock radiating anteriorly to encompass the quad; spasm in his mid-right calf; ambulation without any significant discomfort; a positive straight leg test,

bilaterally; and good strength with testing of plantar and dorsiflexion exercises. (Tr. 598). It was noted that Dr. Argires recommended anterior lumbar interbody fusion at the L5-S1 segment with a posterior interspinous stabilization with fusion. (Tr. 598).

On June 20, 2011, Plaintiff had a post-operative appointment with PA Fulmer. (Tr. 603). It was noted that Plaintiff reported he was "getting better everyday," but also that he had developed anterior right hip pain. (Tr. 603-604). He was ambulating without a cane and was wearing a back brace. (Tr. 604). His physical examination revealed: well-healed incisions; neuro-vascularly intact distal extremities; 5/5 strength with testing of the ankle plantar and with dorsiflexion exercises; and ambulation without any significant disturbance. (Tr. 604). PA Fulmer indicated Plaintiff was doing "very well" post-operatively. (Tr. 604).

On July 12, 2011, Plaintiff had a post-operative visit with Esther Schlegel, PA-C. (Tr. 605-606). Plaintiff rated his pain at a four (4) out of ten (10), continued to have some right hip pain, and was doing exercises at home. (Tr. 605). His physical examination revealed: a well-healed incision; good ambulation without assistance; full strength in his bilateral lower extremities; and reflexes and sensation within normal limits. (Tr. 606). An x-ray of the lumbar spine showed

stable post-operative status post L5-S1 "ALIF" and interspinous process fusion. (Tr. 606).

On September 6, 2011, Plaintiff had a post-operative follow-up appointment with Dr. Argires. (Tr. 607-608). Plaintiff reported that his pain was worse when sleeping at night, that he had persistent pain that caused difficulty with walking and sleeping, and that he was unable to proceed with physical therapy due to financial issues. (Tr. 607).

On November 29, 2011, Plaintiff had a follow-up appointment with Dr. Argires for axial back pain. (Tr. 759). It was noted he seemed to be "somewhat improved on his antidepressant medication by his report." (Tr. 759).

On December 9, 2011, Plaintiff had an appointment with Dr. Argires for axial back pain. (Tr. 760). Plaintiff complained of some intermittent right leg pain, but was "neurologically stable by exam." (Tr. 760). Dr. Argires discontinued the OxyContin and placed him on Nucynta, and was concerned that his pain may be related to Crohn's Disease. (Tr. 760).

On January 3, 2012, Plaintiff had an appointment with Dr. Argires for his back pain. (Tr. 761). It was noted he was "doing well" and that pain control was much better with Nucynta. (Tr. 761). It was also noted that a recent MRI of the lumbar spine revealed a small bulging disc at L4-L5 with no evidence of ongoing

neural compression and an interbody fusion at L5-S1.  (Tr. 761).

On March 27, 2012, Plaintiff had a follow-up appointment with Dr. Argires for his back pain.  (Tr. 762).  It was noted that Plaintiff was "unchanged" from the last visit.  (Tr. 762).  Dr. Argired noted that Plaintiff reached maximum medical recovery following his surgery and that follow-up could be arranged on an as-needed basis.  (Tr. 762).

## 2.   Twin Rose Primary Health

On February 3, 2010, Plaintiff had an appointment with Eric Hussar, M.D., for follow-up of his anxiety and back pain.  (Tr. 695).  His examination revealed a normal mood and affect.  (Tr. 695).  He was assessed as having Obsessive Compulsive Disorder, Depression, and a herniated lumbar intervertebral disc.  (Tr. 695).

On March 8, 2010, Plaintiff had a follow-up appointment with Scott Schucker, M.D., for anxiety.  (Tr. 691).  It was noted he felt "fine anxiety wise" and that he was "stable on dose [of Xanax] for approx[imately] 2 years now."  (Tr. 691).  A physical examination was normal.  (Tr. 691).  Plaintiff was instructed to follow-up with Dr. Schucker in two (2) months.  (Tr. 692).

On May 7, 2010, Plaintiff had an appointment with Dr. Schucker for follow-up of "chronic intermittent panic attacks" and "burning in his back."  (Tr. 687).  It

was noted that Plaintiff was able to decrease his dose of Xanax to "often twice a day but sometimes even just 1 a day." (Tr. 687). His physical examination revealed he was pleasant, talkative, and in no acute distress. (Tr. 687). His Xanax prescription was refilled and he was instructed to follow-up in two (2) months. (Tr. 688).

On July 6, 2010, Plaintiff had a follow-up appointment with Dr. Schucker for chronic anxiety and neck pain. (Tr. 683). It was noted that Plaintiff's anxiety was "stable on Xanax for several years" and that, although he had a recent surgery for neck pain, he had been getting "new pain." (Tr. 683). His physical examination was normal. (Tr. 684). Plaintiff was instructed to schedule a follow-up appointment to return in about two (2) months. (Tr. 684).

On September 3, 2010, Plaintiff had an appointment with Dr. Schucker for follow-up of chronic anxiety and chronic pain issues. (Tr. 679). It was noted Plaintiff was "very stable" on the Xanax and felt it helped with his anxiety. (Tr. 680). His examination revealed he was pleasant, talkative, and in no acute distress. (Tr. 680). He was instructed to keep taking Xanax and to continue to follow with his neurosurgeon for his chronic neck pain. (Tr. 680).

On January 1, 2011, Plaintiff had a follow-up visit with Dr. Schucker for a cough, chest congestion, and Panic Disorder. (Tr. 670). Plaintiff's examination

revealed mild diffuse wheezing. (Tr. 671). He was instructed to continue taking Xanax and was prescribed a Prednisone burst for wheezing. (Tr. 671).

On March 1, 2011, Plaintiff had a follow-up visit with Dr. Schucker for chronic anxiety. (Tr. 666). There were "no new concerns" at this visit. (Tr. 666). His examination revealed: a normal mood and affect; normal behavior; and normal thought content and judgment. (Tr. 666-667). Dr. Schucker instructed Plaintiff to continue taking Xanax. (Tr. 667).

On April 22, 2011, Plaintiff had an appointment with Dr. Schucker for chest pain worse with movement of his arm and worse with a cough or sneeze for the two (2) weeks prior to this appointment. (Tr. 662). Dr. Schucker reassured Plaintiff the chest pain was muscular in nature. (Tr. 663). The medications he was taking at this appointment included Albuterol, Alprazolam, Amrix, Flovent, Lidocaine, Oxycodone, Oxycontin, Pantoprazole, Sertraline, and Zantac. (Tr. 663-664).

On August 18, 2011, Plaintiff had a follow-up appointment with Dr. Schucker for asthma and reported he had vomited blood. (Tr. 651). His physical examination was normal. (Tr. 652). The medications he was taking at this appointment included Albuterol, Alprazolam, Amrix, Flovent, Lidocaine, Oxycodone, Oxycontin, Pantoprazole, Sertraline, and Zantac. (Tr. 653-654). Dr.

Shucker referred Plaintiff to Gastroenterology. (Tr. 652).

On October 7, 2011, Plaintiff had a follow-up appointment with Dr. Schucker due to a complaint of an on-going cough for the past three (3) weeks. (Tr. 634). His physical examination revealed: a normal range of motion in the neck; a well-developed and well-nourished appearance; and a minimal diffuse wheeze without rales or rhonchi. (Tr. 635). The medications he was taking at this appointment included Albuterol, Alprazolam, Amrix, Flovent, Lidocaine, Oxycodone, Oxycontin, Pantoprazole, Sertraline, and Zantac. (Tr. 637-638). Plaintiff's diagnoses included Panic Disorder, Depression, GERD, herniated lumbar intevertebral disc, Irritable Bowel Syndrome, Lumbosacral Spondylosis without myelopathy, Lumbago, and Asthma, and Dr. Schucker ordered blookwork to check Plaintiff's cholesterol and to check for HIV. (Tr. 634-637). Dr. Shucker prescribed Prednisone for the cough. (Tr. 637).

On December 7, 2011, Plaintiff had an appointment with Dr. Shucker for follow-up of his anxiety and back pain. (Tr. 779). A physical examination revealed Plaintiff: was well-developed and well-nourished; had normal range of motion in his neck; and exhibited no edema in his musculoskeletal system. (Tr. 782). Plaintiff was assessed as having Panic Disorder, GERD, Hematemesis, and Lumbago, and his Xanax prescription was refilled. (Tr. 782).

On January 31, 2012, Plaintiff had a follow-up appointment with Dr. Schucker for his ongoing anxiety and back pain. (Tr. 784). His physical examination revealed Plaintiff had a normal mood, affect, behavior, judgment, and thought content. (Tr. 789). It was noted that Plaintiff would be getting a colonoscopy for rectal bleeding, vomiting, and pain. (Tr. 788). Dr. Shucker refilled Plaintiff's Xanax prescription and noted he had "been stable on same dose for years [without an] increase." (Tr. 789).

On March 27, 2012, Plaintiff had a follow-up appointment with Dr. Schucker for his ongoing anxiety and back pain. (Tr. 792). It was noted his back pain was stable and that Plaintiff was "doing ok" with his anxiety. (Tr. 797). His physical examination revealed Plaintiff had a normal mood, affect, behavior, judgment, and thought content. (Tr. 797). Dr. Shucker refilled Plaintiff's Xanax prescription, noting he had "been stable on same dose for years," and instructed Plaintiff to follow-up in two (2) months. (Tr. 797).

On June 11, 2012, Plaintiff had an appointment with Dr. Shucker for asthma exacerbation and for follow-up after an emergency room visit for falling out bed and hitting his head, which caused neck pain. (Tr. 819, 824). His physical examination was normal. (Tr. 826). Plaintiff was assessed as having GERD, a herniated lumbar intervertebral disc, Panic Disorder, and Depression, and was

prescribed an increased dose of Zoloft. (Tr. 826).

On July 9, 2012, Plaintiff had an appointment with Dr. Schuckerfor chronic anxiety and back pain. (Tr. 1000). It was noted that Plaintiff felt the Xanax was not working as well because he was more stressed and depressed. (Tr. 1000). A physical examination was normal. (Tr. 1002). Plaintiff's pain medications were refilled, he was advised to continue on the same dose of Xanax, and he was instructed to follow-up in one (1) month. (Tr. 1002).

On August 2, 2012, Plaintiff had a follow-up appointment with Dr. Shucker for his chronic anxiety and back pain, both of which were listed as "stable." (Tr. 1011). A physical examination was normal. (Tr. 1011). Plaintiff was instructed to continue on his same medications and to follow-up in one (1) month. (Tr. 1011).

On August 31, 2012, Plaintiff had a follow-up appointment for ongoing, chronic anxiety and back pain. (Tr. 1020). It was noted that Plaintiff was "swallowing ok from recent Nissen," that his GERD was stable, and that his Xanax dose was stable. (Tr. 1020, 1022). A physical examination was normal. (Tr. 1022). Plaintiff was instructed to follow-up in one (1) month. (Tr. 1022).

On September 28, 2012, Plaintiff had an appointment with Dr. Shucker for follow-up of his chronic problems. (Tr. 1036). It was noted that Plaintiff admitted

to recently abusing Xanax and Opiates. (Tr. 1036). A physical examination was normal. (Tr. 1038). Plaintiff was assessed as having Depression, Polysubstance Abuse, Panic Disorder, and a herniated lumbar intervertebral disc. (Tr. 1038). Plaintiff was switched to Klonopin with the plan to continue to "wean off benzo's completely," had his pain medications refilled, and was scheduled for a follow-up in one (1) month. (Tr. 1038).

On October 12, 2012, Plaintiff had a follow-up appointment with Dr. Schucker after an emergency room visit due to being "slightly light-headed." (Tr. 1041). It was noted his blood work was "all normal" and that he was withdrawing off the Xanax he had been abusing. (Tr. 1046). A physical examination was normal. (Tr. 1046). Plaintiff was scheduled for a follow-up appointment in two (2) weeks. (Tr. 1047).

On October 26, 2012, Plaintiff had a follow-up appointment with Dr. Schucker for abuse of Xanax. (Tr. 1054). It was noted that Plaintiff felt "surprisingly well" and requested non-addictive medicine for anxiety. (Tr. 1054). A physical examination was normal. (Tr. 1056). Plaintiff was instructed to start Seroquel and to wean off Klonopin over the next two (2) weeks, with a follow-up scheduled in one (1) month. (Tr. 1056).

On November 26, 2012, Plaintiff had a follow-up appointment with Dr.

Schucker for chronic anxiety, depression, and recent substance abuse of prescription medications.  (Tr. 1067).  Plaintiff reported that the depression was still a struggle, but that Seroquel had been slightly helpful so far.  (Tr. 1067). Plaintiff noted that discontinuing Xanax was "remarkably easy."  (Tr. 1067).  A physical examination was normal.  (Tr. 1069).  Plaintiff was instructed to follow up in four (4) weeks.  (Tr. 1070).

On December 21, 2012, Plaintiff had a follow-up appointment with Dr. Schucker.  (Tr. 1072).  Plaintiff reported he felt "ok," that Seroquel was "working well for him," and that the pain in his back was "stable."  (Tr. 1077).  A physical examination was normal.  (Tr. 1079).  Plaintiff's pain medications were refilled, and his GERD and Depression were listed as stable with medications.  (Tr. 1079). Plaintiff was instructed to follow-up in one (1) month.  (Tr. 1079).

On January 8, 2013, Plaintiff had a follow-up appointment with Dr. Shucker.  (Tr. 1087).  It was noted that the Seroquel was "doing well for him" and that he needed new pain medications because his insurance would no longer cover his OxyContin prescription.  (Tr. 1087).  A physical examination was normal.  (Tr. 1089).  Plaintiff was switched to Opana for pain, his depression was listed as stable, and he was instructed to follow-up in one (1) month.  (Tr. 1090).

On February 6, 2013, Plaintiff had an appointment with Dr. Shucker for

rectal bleeding with diarrhea. (Tr. 1097). Plaintiff reported the Opana helped his pain, but not as much as the Oxycontin, and that he felt he was "doing ok" with the current medications for depression. (Tr. 1097). Plaintiff's examination was normal. (Tr. 1099). Plaintiff's Opana dose was increased, he was listed as stable on Seroquel for depression, and he was instructed to follow-up in one (1) month. (Tr. 1100).

On March 6, 2013, Plaintiff had an appointment with Dr. Schucker for follow-up of his depression. (Tr. 1107). It was noted that Plaintiff's lower back pain and depression were stable on medications. (Tr. 1107). Plaintiff's examination was normal. (Tr. 1109). Plaintiff was instructed to continue his medications and follow-up in one (1) month. (Tr. 1109).

On March 26, 2013, Plaintiff had an appointment with Dr. Schucker for vomiting blood, which he stated started that morning and had been "going on for years," and rectal bleeding. (Tr. 1118). It was noted he was unaccompanied to this appointment. (Tr. 1119). His physical examination was normal. (Tr. 1119). Dr. Schucker ordered a CBC with differential and referred Plaintiff to Lancaster Gastroenterology. (Tr. 1119). He also instructed Plaintiff to resume daily protonix and to go to the emergency room if the bleeding continued. (Tr. 1119).

On April 23, 2013, Plaintiff had an appointment with Dr. Schucker for back

pain, chronic anxiety and depression, and follow-up of his rectal bleeding. (Tr. 1129). It was noted that Plaintiff admitted to being more depressed than usual, but had no suicidal or homicidal ideations. (Tr. 1129). A physical examination was normal. (Tr. 1131). Dr. Schucker's plan was for Plaintiff to continue on the same narcotic pain medications with a plan to stop Oxycodone next month and increase Opana, to stop Zoloft and start Cymbalta, and to follow-up in five (5) weeks. (Tr. 1132).

On May 24, 2013, Plaintiff had an appointment with Dr. Schucker for follow-up of his medical problems. (Tr. 1140). It was noted that Plaintiff attended this appointment unaccompanied. (Tr. 1143). Plaintiff reported that his lower back pain was slightly worse, he was having more radicular pain in the right leg, he felt weak, felt more anxiety and stress, and he felt like his mental health medications were not working too well. (Tr. 1140). A physical examination was normal. (Tr. 1142). Plaintiff was assessed as having Lumbago, Depression, Panic Disorder, GERD, and a herniated lumber intervertebral disc. (Tr. 1142). The plan was to discontinue all of Plaintiff's short-acting medications, increase Opana slightly, increase Seroquel, and follow-up in one (1) month. (Tr. 1142).

On June 24, 2013, Plaintiff had an appointment with Dr. Schucker for follow-up of his medical problems. (Tr. 1140). Plaintiff reported that he was

experiencing more anxiety and stopped taking Cymbalta because he did not like to swallow capsules.  (Tr. 1188).  A physical examination was normal.  (Tr. 1190). Plaintiff was assessed as having Lumbago, Depression, Barrett's Esophagus, GERD, and a herniated lumber intervertebral disc.  (Tr. 1190).  Plaintiff received a refill for Opana and was instructed to follow-up in one (1) month.  (Tr. 1191).

On July 22, 2013, Plaintiff had an appointment with Dr. Schucker for follow-up of his medical problems.  (Tr. 1200).  It was noted that Plaintiff felt "ok," and that he was on probation for attacking an off-duty police officer.  (Tr. 1200).  A physical examination was normal.  (Tr. 1203).  Plaintiff was assessed as having a history of Polysubstance Abuse and a herniated lumber intervertebral disc.  (Tr. 1203).  Plaintiff received a refill for Opana and was instructed to follow-up in one (1) month.  (Tr. 1203).

On August 20, 2013, Plaintiff had an appointment with Dr. Schucker for follow-up of his medical problems.  (Tr. 1210).  It was noted that Plaintiff attended the appointment unaccompanied and that he was having no problems with his current medications.  (Tr. 1210).  A physical examination was normal. (Tr. 1212).  Plaintiff was assessed as having a herniated lumber intervertebral disc, Depression, OCD, and intermittent Asthma.  (Tr. 1213).  Plaintiff received a refill for Opana and was instructed to follow-up in one (1) month.  (Tr. 1213).  Plaintiff

was also instructed to quit smoking.  (Tr. 1213).

On September 11, 2013, Plaintiff had an appointment with Dr. Schucker for follow-up of his medical problems.  (Tr. 1220).  It was noted that Plaintiff was unaccompanied and had abdominal pain without bleeding.  (Tr. 1220).  A physical examination was normal.  (Tr. 1221).  Plaintiff was assessed as having constipation.  (Tr. 1221).  Plaintiff was instructed to take Miralax.  (Tr. 1221).

On September 20, 2013, Plaintiff had an appointment with Dr. Schucker for back pain and depression.  (Tr. 1227).  It was noted that Plaintiff was unaccompanied and "overall [felt] stable."  (Tr. 1227).  A physical examination was normal.  (Tr. 1229).  Plaintiff's Seroquel dosage was increased and he was instructed to follow-up in one (1) month.  (Tr. 1230).

On October 15, 2013, Plaintiff had an appointment with Dr. Schucker for a medication check.  (Tr. 1239).  It was noted that Plaintiff was unaccompanied and that he felt "overall ok."  (Tr. 1239).  A physical examination was normal.  (Tr. 1241).  Plaintiff was assessed as having lumbar radiculopathy, Depression, and a history of Polysubstance Abuse.  (Tr. 1241).  Plaintiff was instructed to take follow-up in one (1) month.  (Tr. 1242).

On November 15, 2013, Plaintiff had an appointment with Dr. Schucker for follow-up of his chronic back pain and depression.  (Tr. 1250).  A physical

examination was normal. (Tr. 1254). Plaintiff was assessed as having lumbar radiculopathy, Panic Disorder, Depression, and rectal bleeding. (Tr. 1254). Plaintiff's Opana prescription was refilled, a trial of Atarax was ordered for his anxiety, and he was instructed to take follow-up in one (1) month. (Tr. 1254).

### 3.    Gastroenterology Associates of York

On September 9, 2011, Plaintiff had an appointment with Roland Friedrich, M.D., after a sudden onset of vomiting blood two (2) weeks earlier and rectal bleeding on a daily basis. (Tr. 610). His physical examination revealed Plaintiff: was well developed; had normal eyes, a normal neck, and a normal respiratory exam; had mild tenderness to palpation in the epigastrium and right upper quandrant; had a normal affect and normal gait; and was oriented to time, space, and person . (Tr. 611-612). Dr. Friedrich noted Plaintiff had a history of Barrett's Esophagus, Gastroesophageal Reflux, Hematochezia, and colonic polyps. (Tr. 612). Dr. Friedrich ordered an upper endoscopy with Barrett's biopsies to rule out erosive esophagitis and peptic ulcer disease. (612).

### 4.    Premier Medical Center Memorial Hospital

On June 9, 2012, Plaintiff presented to the emergency room after developing neck pain and bilateral upper extremity tingling after falling out of bed early in the morning. (Tr. 766-767). Plaintiff denied vomiting or visual problems. (Tr. 767).

A physical examination revealed Plaintiff: was well-nourished, alert, and oriented; had full range of motion in his neck and no spasms with moderate pain in the left lateral area; had clear speech, a normal affect, and appropriate responses to questions; had no back tenderness; was neurologically intact; had 5/5 strength in all extremities without swelling or tenderness; had equal grip strength, bilaterally; and had intact upper extremity reflexes. (Tr. 766-767). X-rays were negative for a fracture and dislocation, and Plaintiff was placed on Prednisone for a diagnosis of cervical strain. (Tr. 768, 771).

###   B.   Tests and Procedures

####     1.   Bone Scan of the Cervical Spine

On September 17, 2010, Plaintiff underwent a bone scan of the cervical spine. (Tr. 490). The impression was that "[t]here is focal increased uptake in the midcervical spine at the C4-C5 level which corresponds to the postsurgical changes and is nonspecific in nature within 1 year after surgery as described above." (Tr. 490).

####     2.   MRI of the Lumbar Spine

On April 29, 2011, Plaintiff underwent an MRI of her lumbar spine due to right-sided low back pain after a fall a day prior that caused pain to radiate into the right leg with numbness and tingling in the toes. (Tr. 494). The MRI revealed the

following: a hemangioma in the L5 vertebral body; mild disc space narrowing and dessiccation at L5-S1; a minimal broad-based protrusion centrally without significant canal or foraminal narrowing at the L5-S1 level; and mild degenerative discogenic changes at L5-S1 [that were] "grossly stable when compared to prior study." (Tr. 494).

On December 16, 2011, Plaintiff underwent another MRI of the lumbar spine after the L5-S1 surgical fusion. (Tr. 531). The impression from this MRI was that Plaintiff had: (1) no disc herniation or canal stenosis at any level in the lumbar spine; and (2) a new slight central disc protrusion at L4-L5 that did not affect adjacent structures. (Tr. 532).

### 3.     MRI of the Brain

On May 17, 2011, Plaintiff underwent an MRI of the brain for headaches and visual disturbances. (Tr. 495). The impression from this test is that Plaintiff had a "[n]ormal brain." (Tr. 495).

### 4.     Epidurals, Medial Branch Blocks, and Radiofrequency Ablations

On July 9, 2010, Dr. Thurman gave Plaintiff an epidural injection into the C7-T1 intralaminar for cervical sponylosis and right cervical radiculopathy. (Tr. 564). On July 23, 2010, Dr. Thurman gave Plaintiff an epidural injection into the

T1-2 intralaminar for neck pain, cervical spondylosis, and cervical radiculopathy. (Tr. 565). On October 13, 2010, Plaintiff underwent an L5-S1 interlaminar epidural steroid injection for low back pain and lumbar spondylosis. (Tr. 570). On October 27, 2010, Plaintiff underwent a right C4, C5 and C6 medial branch block for neck pain, cervical spondylosis, and right C4-C5 and C5-C6 facet arthropathy. (Tr. 571). On November 4, 2010, Plaintiff underwent an L5-S1 interlaminar epidural steroid injection for low back pain and lumbar spondylosis. (Tr. 572). On November 18, 2010, Plaintiff underwent a medial branch block at the right C3, C4, C5 and C6 levels for neck pain, cervical spondylosis, and facet pain at the right C3-C4, C4-C5, and C5-C6 levels. (Tr. 591). On November 29, 2010, Plaintiff underwent a medial branch radiofrequency ablation at the right C3, C4, C5, and C6 levels for neck pain, cervical spondylosis, and right C3-C4, C4-C5, and C5-C6 facet arthropathy. (Tr. 573). On January 26, 2011, Plaintiff underwent a medial branch block at the bilateral L3 and L4 levels and a bilateral L5 primary dorsal ramus block for low back pain, lumbar spondylosis, and bilateral facet arthropathy at L4-L5 and L5-S1. (Tr. 594-595). On February 14, 2011, Plaintiff underwent bilateral L3 and L4 medial branch and bilateral L5 dorsal ramus radiofrequency ablation for low back pain, lumbar spondylosis, and bilateral L4-L5 and L5-S1 arthropathy. (Tr. 575).

## 5. Anterior Lumbar Interbody Fusion at L5-S1

From June 9, 2011 to June 11, 2011, Plaintiff was admitted to Lancaster General Hospital to undergo an elective anterior lumbar interbody fusion with a posterior interspinous stabilization for low back pain related to degenerative disc disease and instability at L5-S1. (Tr. 500). It was noted that Plaintiff did "very well" post-operatively, that his pain was controlled, and that he felt stable for discharge. (Tr. 500).

## 6. Upper Endoscopies

On September 14, 2011, Plaintiff underwent an upper endoscopy performed by Dr. Friedrich. (Tr. 623-624). The impression from this test was that Plaintiff had: (1) mucosa suggestive of Barrett's esophagus; (2) a hiatal hernia; (3) antral gastritis; and (4) no signs of ulcers of bleeding lesions. (Tr. 624). Plaintiff was instructed to take anti-reflux measures, continue current medications, and follow-up in three (3) years if Barrett's is present. (Tr. 624). The biopsy from this endoscopy found gastritis and distal esophagus in an irregular "z-line." (Tr. 625).

On July 25, 2013, Plaintiff underwent another Upper Endoscopy performed by Steven Chen, M.D., for Hematemesis and a follow-up of Barrett's Esophagitis. (Tr. 1262). The impression was that Plaintiff had: Grade A reflux esophagitis; chronic gastritis; and chronic duodenitis. (Tr. 1262).

### 7. Laparoscopic Nissen Fundoplication

On July 27, 2012, Plaintiff underwent a Laparoscopic Nissen Fundoplication performed by Ignacio Prats, M.D., to repair a hiatal hernia that was causing GERD and chronic reflux esophagitis. (Tr. 843, 846, 850). Plaintiff was instructed to follow-up in four (4) weeks after doing well post surgery. (Tr. 869).

### C. Medical Opinions

### 1. Jonathan Rightmyer, Ph.D.- State Agency Physician

On October 21, 2011, Dr. Rightmyer completed a "Psychiatric Review Technique" form for Plaintiff based on his medical records up to that date. (Tr. 119-120). He opined Plaintiff did not meet the "B" Criteria for Impairment Listing 12.04, Affective Disorders, because Plaintiff had: (1) mild restriction of activities of daily living; (2) mild difficulties in maintaining social functioning; (3) mild difficulties in maintaining concentration, persistence, or pace; and (4) no repeated episodes of decompensation. (Tr. 119). He also opined Plaintiff did not meet the "C" criteria for this Listing. (Tr. 119).

## 2. Jason Richards, SDM

On October 21, 2011, Single Decision Maker, ("SDM"),[9] Jason Richards completed a "Physical Residual Functional Capacity" form. (Tr. 121-122). He opined that Plaintiff: (1) could occasionally lift and/ or carry up to twenty (20) pounds; (2) could frequently lift and/ or carry up to ten (10) pounds; (3) could stand, walk, and/ or sit for up to six (6) hours in an eight (8) hour workday; and (4) could engage in unlimited pushing and pulling within the aforementioned weight restrictions. (Tr. 121).

## 3. Shruti Dhorajia, D.O.- Consultative Examiner

On October 9, 2012, Plaintiff underwent a consultative examination performed by Dr. Dhorajia. (Tr. 879-891). It was noted that Plaintiff's medical problems included the following: heart murmur; dizziness; migraine; cephalgia; stroke; Barrett's Esophagus; colon polyp; constipation; Crohn's Disease; diarrhea; GERD; hemorrhoids; hiatal hernia; Irritable Bowel Syndrome; chronic back pain; Degenerative Disc Disease; osteoarthritis; anxiety; depression; Bipolar Disease; tuberculosis; Asthma; pneumonia; and "MI." (Tr. 880). Plaintiff reported he

---

9. An "SDM" is an abbreviation for "Single Decision Maker." http://nls.org/Disability/VocationalRehabilitation/BenefitsManagementManual2009Version/Chapter1. After an extensive review of the record and other cites, there is no evidence that Paula Vanscoy is a medical doctor, doctor of osteopathic medicine, or any other title in the medical profession.

experienced: chronic back pain that radiated down the right leg into his big toe with only moderate relief provided by pain pills; hemorrhaging of his rectum; resolved hermatemesis post-fundoplication; and withdrawal symptoms from discontinuation of Xanax. (Tr. 880). A physical examination revealed Plaintiff: was alert, awake, oriented, in no apparent distress, anxious, and coherent; had a normal gait; could stand on his heels and toes, but could not walk on his heels; could not sit on or get up from a low step; had 5/5 muscle strength in all extremities; had a positive straight leg test in the supine position on the right side; and had good and equal grip strength. (Tr. 881-882). Dr. Dhorajia opined, "per patient," that Plaintiff: could occasionally lift and/ or carry up to five (5) pounds; could stand and/ or walk for up to twenty (20) minutes and sit for up to thirty (30) minutes in an eight (8) hour workday; was limited in pushing and pulling in all extremities; could occasionally bend, kneel, stoop, crouch, balance, and climb; had no problems reaching, handling, fingering, feeling, speaking, tasting, or smelling; and should avoid cold temperatures. (Tr. 881, 885-886).

### 4.     Juan B. Mari-Mayans, M.D.

On October 17, 2012, Dr. Mari-Mayans completed a "Physical Residual Functional Capacity" form based on Plaintiff's records up to that date. (Tr. 141-142). He opined that Plaintiff: (1) could occasionally lift and/ or carry up to

twenty (20) pounds; (2) could frequently lift and/ or carry up to ten (10) pounds;

(3) could stand, walk, and/ or sit for up to six (6) hours in an eight (8) hour

workday; and (4) could engage in unlimited pushing and pulling within the

aforementioned weight restrictions.  (Tr. 141-142).

### 5.　　James Vizza, Ph.D.

On October 18, 2012, Dr. Vizza completed a "Psychiatric Review

Technique" form for Plaintiff based on his medical records up to that date.  (Tr.

140-141).  He opined Plaintiff did not meet the "B" Criteria for Impairment

Listing 12.04, Affective Disorders, of for Impairment Listing 12.06, Anxiety

Disorders, because Plaintiff had: (1) mild restriction of activities of daily living;

(2) mild difficulties in maintaining social functioning; (3) mild difficulties in

maintaining concentration, persistence, or pace; and (4) no repeated episodes of

decompensation.  (Tr. 140).  He also opined Plaintiff did not meet the "C" criteria

for this Listing.  (Tr. 140).

### 6.　　Scott Shucker, M.D.- Treating Physician

On August 17, 2012, Dr. Shucker completed a check-box form for the

Pennsylvania Department of Welfare.  (Tr. 1025-1028).  Dr. Shucker opined

Plaintiff was temporarily disable from August 12, 2012 to August 18, 2013 due to

chronic lower back pain.  (Tr. 1027).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld.  42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of

evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence.  <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d

at 706-07.  Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir.

1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and

36

claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474

F.3d at 91-92.  This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity, (2) has an

impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other

work in the national economy.  Id.  As part of step four, the Commissioner must

determine the claimant's residual functional capacity.  Id.  If the claimant has the

residual functional capacity to do his or her past relevant work, the claimant is not

disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one

through four."  Residual functional capacity is the individual's maximum

remaining ability to do sustained work activities in an ordinary work setting on a

regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg.

34475 (July 2, 1996).  A regular and continuing basis contemplates full-time

employment and is defined as eight hours a day, five days per week or other

similar schedule.  The residual functional capacity assessment must include a

discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945;

Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that

which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured of December 31, 2012. (Tr. 44). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from his amended alleged onset date of January 1, 2010. (Tr. 44).

At step two, the ALJ determined that Plaintiff suffered from the severe[10]

---

10. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's

combination of impairments of the following: "degenerative disc disease of the cervical and lumbar spine; and asthma (20 C.F.R. 404.1520(c) and 416.920 (c))." (Tr. 44-46).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (Tr. 46).

At step four, the ALJ determined that Plaintiff had the RFC to perform sedentary work with limitations. (Tr. 46-49). Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, [Plaintiff] has the [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he must be able to alternate between sitting and standing at will. [Plaintiff] is limited to occasional overhead bilateral reaching. He is limited to occasional crouching, squatting, kneeling, stooping, bending, and climbing of ramps and stairs. [Plaintiff] should never climb ladders, ropes or scaffolds. Furthermore, he is precluded from concentrated exposure to cold.

(Tr. 46).

_____

ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

The ALJ then determined that Plaintiff is capable of performing past relevant work as a dispatcher, "motor vehicles, DOT# 249.167-014, light as actually performed and sedentary as generally performed, SVP 5. This work does not require the performance of work-related activities precluded by [Plaintiff]'s [RFC] (20 CFR 404.1565 and 416.965)." (Tr. 49-50).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between January 1, 2010, the amended alleged onset date, and the date of the ALJ's decision. (Tr. 50).

## DISCUSSION

On appeal, Plaintiff asserts that: (1) his spinal disorder and depression meet or medically equal Impairment Listings; and (2) he is disabled under the Medical Vocational Rules. (Doc. 9, pp. ). Defendant disputes these contentions. (Doc. 12, pp. 10-19).

### 1.    Step Three Analysis- Impairment Listing 1.04(C)

Plaintiff asserts that the ALJ erred in determining that Plaintiff did not meet Impairments Listing 1.04(c), Spinal Disorders, because the medical records and his own testimony prove that he meets this Listing. (Doc. 9, pp. 3-7).[11] Plaintiff

11. While Plaintiff initially states that the ALJ erred in concluding his depression did not meet or medically equal a Listing Impairment, because Plaintiff failed to support this contention asserted in his brief in support and did not even make

also argues that not only did his back impairments meetListing 1.04(C), but also that the ALJ failed to provide an explanation as to why Plaintiff did not meet this Listing.

With regard to the latter assertion that the ALJ failed to provide, in the step three discussion section, an explanation as to why Plaintiff did not meet Listing 1.04, it is determined that Plaintiff's argument is unfounded because the ALJ discussed all relevant medical evidence in relation to Listing 1.04(C) in the RFC section of her opinion. In <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 119-120 (3d Cir. 2000), the United States Court of Appeals for the Third Circuit

---

reference to a respective Listing for this impairment, this argument has been waived and is not proper for consideration by this Court. <u>See</u> <u>Harris v. Dow Chemical Co.</u>, 2014 WL 4801275 (3d Cir. Sept. 29, 2014) (holding that an argument is waived and abandoned if briefly mentioned in the summary of the argument, but not otherwise briefed); <u>Laborers' Int'l Union of N. America, AFL-CIO v. Foster Wheeler Corp.</u>, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it . . . and . . . 'a passing reference to an issue . . . will not suffice to bring that issue before this court.'") (citing <u>Frey v. Grubine's RV</u>, 2010 WL 4718750, at *8 (M.D. Pa. Nov. 15, 2010)); <u>Karchnak v. Swatara Twp.</u>, 2009 WL 2139280, at *21 (M.D. Pa. July 10, 2009) ("A party waives an issues if it fails to brief it in its opening brief; the same is true for a party who merely makes a passing reference to an issue without elaboration.") (citing <u>Gorum v. Sessions</u>, 561 F.3d 179, 185 n.4 (3d Cir. 2009)). As such, because Plaintiff has failed to brief this assertion by providing an Impairment Listing, but rather only made a passing reference in his brief, Plaintiff has waived his contention that the ALJ erred in finding that his Depression did not meet the respective Listing requirements.

held that an administrate law judge is required to set forth the reasons for his/her

decision, and that a bare conclusory statement that an impairment did not match,

or is not equivalent to, a listed impairment is insufficient.  However, the Third

Circuit Court of Appeals further explained the holding in Burnett:

> Burnett does not require the ALJ to use particular language or
> adhere to a particular format in conducting his analysis.
> Rather, the function of Burnett is to ensure that there is
> sufficient development of the record and explanation of finding
> to permit meaningful review.  In this case, the ALJ's decision,
> read as a whole, illustrates that the ALJ considered the
> appropriate factors in reaching the conclusion that [the
> plaintiff] did not meet the requirements for any listing,
> including Listing 3.02(A).  The ALJ's opinion discusses the
> evidence pertaining to chronic obstructive and restrictive lung
> disease, specifically referencing 'pulmonary function studies . .
> . consistent with moderately severe obstructive and restrictive
> defects,' but pointing to the lack of pulmonary complications,
> and a finding that claimant's lungs were clear.  Also, the ALJ
> noted that claimant's medical history showed no frequent
> hospitalization or emergency treatments.  Tr. At 13-14.  This
> discussion satisfies Burnett's requirement that there be
> sufficient explanation to provide meaningful review of the step
> three determination.

Jones v. Barnhart, 364 F.3d, 501, 505; See Rivera v. Commissioner of Social

Security, 164 F.App'x 260, 263 (3d. Cir. 2006) (holding that an ALJ's failure to

explain a determination that a plaintiff does not meet a Listing is harmless error if

". . . in reviewing the voluminous medical evidence available to us, we found

abundant evidence supporting the position taken by the ALJ, and comparatively

little contradictory evidence" and thus does not warrant remand.).

In the case at hand, the ALJ sufficiently developed the record, and, in the RFC discussion section, explained her finding that Plaintiff's back impairments did not meet Listing 1.04(C) in a manner sufficient enough to permit meaningful review of this conclusion. (Tr. 44-48). It is concluded that, in accordance with Burnett, "the ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that [the plaintiff] did not meet the requirements for any listing, including Listing [1.04(C)]." Therefore, we will not disturb the ALJ's decision at step three based on this assertion.

Moreover, even if it were determined that the ALJ erred in not explaining at step three why Plaintiff's back impairments did not meet Listing 1.04(C), it remains that such an error was harmless due to the abundant evidence supporting her position that Plaintiff did not meet all of the criteria in Listing 1.04(C) as discussed by the ALJ throughout her decision. (Tr. 44-48). A claimant bears the burden of showing that her impairment meets or equals a listed impairment, and that she is thus presumptively disabled. Burnett, 220 F.3d at 120 n.2 (citing Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992)). A plaintiff must meet all of the specified requirements of a Listing in order to be considered presumptively disabled. Sullivan v. Zebley, 493 U.S. 521, 532 (1990); 20 C.F.R.

§ 404.1525(a); 20 C.F.R. pt. 404, subpt. P, app. 1. "For a claimant to show his

impairment matches a listing, it must meet <u>all</u> of the specified medical criteria.  An

impairment that manifests only some of those criteria, no matter how severely,

does not qualify." <u>Jones</u>, 364 F.3d at 504 (citation omitted) (emphasis in original).

A claimant meets Listing 1.04(C) if he or she can prove the following:

> Disorders of the spine (e.g., herniated nucleus pulpous, spinal
> arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc
> disease, facet arthritis, vertebral fracture), resulting in
> compromise of a nerve root (including the cauda equina) or the
> spinal cord.  With:
> ...............................................................................................
> C. Lumbar spinal stenosis resulting in
> pseudoclaudication, established by findings on appropriate
> medically acceptable imaging, manifested by chronic
> nonradicular pain and weakness, and resulting in inability to
> ambulate effectively, as defined in 1.00B2b.

20 C.F.R. pt 404, subpt. P, app. 1, § 1.04(C).  "Neurogenic claudication is

synonymous with pseudoclaudication." <u>Holland v. Comm'r Soc. Sec. Admin.</u>,

2014 U.S. Dist. LEXIS 76164, at *2, n.2 (D. Md. June 3, 2014) (citing Thomas N.

Byrne et al., *Diseases of the Spine and Spinal Cord* 148 (2000)); <u>see also</u> <u>Naegele</u>

<u>v. Barnhart</u>, 433 F. Supp. 2d 319, 323 (W.D.N.Y. 2006) ("Pseudoclaudication, or

neurogenic claudication, means intermittent limping caused by lumbar spinal

stenosis") (citing *Stedman's Medical Dictionary* 360 (27th ed. 2000)).

In the case at hand, the ALJ repeatedly cites the medical records that

support her finding that Plaintiff did not meet his burden of proving his back impairments met all the criteria for Listing 1.04(C). The ALJ discusses that Plaintiff's physical examinations were largely unremarkable because he had intact 5/5 muscle strength in all extremities, normal gait, good grip strength, and intact sensation. (Tr. 44-48). Thus, the criteria of Listing 1.04(C) that Plaintiff's condition result in pseudoclaudication and an inability to ambulate effectively was not met.

Furthermore, as noted by the ALJ, diagnostic studies do not mention a definite compromise of a nerve root or the spinal cord because two separate MRIs of Plaintiff's spine showed that he did not have the requisite neural foraminal narrowing or spinal stenosis. (Tr. 47). Despite Plaintiff's allegations of disabling pain and radiculopathy, "[a] conceivable possibility of intermittent nerve root impingement does not establish a compromise of a nerve root." Ragsdale v. Astrue, 2012 WL 5289635, at *7 (W.D. Mo. Oct. 23, 2012) (internal quotations omitted); accord Bogart v. Colvin, 2013 WL 5937041, at *2-3 (W.D. Ark. Nov. 6, 2013). As such, the potential for nerve root impingement for Listing 1.04(C) has also not been met.

Accordingly, substantial evidence supports the ALJ's reasoning that Plaintiff was able to ambulate effectively with a normal gait and did not have a

comprise of nerve roots or his spinal cord.  Thus, Plaintiff did not meet his burden

of proving his back impairments met all the criteria for Listing 1.04(C).  As such,

the ALJ's decision at step three that Plaintiff's back impairments did not meet

Listing 1.04(C) will not be disturbed on appeal.

## 2. <u>Residual Functional Capacity Determination and the Vocational Expert's Testimony</u>

Plaintiff asserts that the ALJ erred in the RFC determination and the

resulting hypotheticals posed to the VE, which Plaintiff contends resulted in a

faulty determination that Plaintiff could perform past relevant work.  (Doc. 9, pp.

8-11).  In support of these arguments, Plaintiff asserts that the ALJ: (1) failed to

consider his attendance of special education classes, which he argued would limit

him to unskilled work; (2) failed to consider his depression that would limit his

ability to concentrate and remember simple tasks; (3) did not take into account his

description of pain in his legs, that allegedly left him more limited with sitting,

standing, and walking than provided for in the RFC; (4) improperly disregarded

the portion of Dr. Dhorijia's opinion that Plaintiff could lift five (5) to six (6)

pounds occasionally, which would mean he could not perform sedentary work,

which requires occasional lifting and/ or carrying of up to ten (10) pounds; and (5)

improperly relied on the VE's testimony as it was "inconsistent with the

Dictionary of Occupational Titles (DOT)." (Id. at 8-11).

The responsibility for deciding a claimant's RFC rests with the administrative law judge. See 20 C.F.R. § 404.1546. The Court recognizes that the residual functional capacity assessment must be based on a consideration of all the evidence in the record, including the testimony of the claimant regarding her activities of daily living, medical records, lay evidence and evidence of pain. See Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 121-122 (3d Cir 2000). The Commissioner's regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions." See 20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. See 20 C.F.R. §404.1527(c).

In the case at hand, ALJ concluded that Plaintiff had the RFC to perform sedentary work with a range of limitations, including: a sit/stand option at will; only occasional overhead bilateral reaching; occasional crouching, squatting, kneeling, stooping, bending, and climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; and no concentrated exposure to the cold. (Tr. 46).

47

Upon review of the record, it is determined that the ALJ's RFC determination is supported by substantial evidence because, in determining the RFC, the ALJ relied not only the medical opinions and medical evidence, but also on Plaintiff's testimony as to what he could do. (Tr. 44-48). In formulating the RFC, the ALJ: (1) discussed the medical evidence that noted Plaintiff was neurologically stable, had only intermittent right leg pain, had low back pain that was listed as stable on medications, consistently had 5/5 muscle strength in his bilateral upper and lower extremities, consistently had good grip strength, had a normal gait, and was doing "well" post surgery; (2) relied on Plaintiff's own testimony that he was able to drive, take care of his personal hygiene, do the laundry, pay bills, grocery shop, spend time with others, watch television, use the computer, reach, talk, use his hands, get along with others, and lift about ten (10) pounds; and (3) relied on the medical opinion of Dr. Dorhijia. (Tr. 44-48, 101-104, 283-290, 885-886). While Plaintiff argues Dr. Dhorijia limited Plaintiff to lifting only up to six (6) pounds, it was noted in this limitations in this form were "per patient," meaning the limitations were based on Plaintiff's self-reported limitations. (Tr. 885-886). Furthermore, Plaintiff testified at his hearing that he was able to lift up to ten (10) pounds. (Tr. 101-104). Regarding Plaintiff's assertions that he should have been limited to unskilled work due to the fact that he attended special education classes

and had depression, the medical records do not support this contention because it does not state anywhere in the medical records that Plaintiff had difficulty concentrating or remembering things due to these conditions. Regarding Plaintiff's argument that the ALJ did not take into account his description of pain in his legs, that allegedly left him more limited with sitting, standing, and walking than provided for in the RFC, the ALJ most certainly accounted for these limitations by providing a sit/stand option at will in the RFC. (Tr. 46, 107-108. As such, the ALJ's RFC determination is supported by substantial evidence.

Based on this properly determined RFC, the ALJ posed hypotheticals to the VE that included all the RFC limitations. (Tr. 107-108). A hypothetical question posed by the administrative law judge to the vocational expert must include all of a claimant's functional limitations which are supported by the record. Ramirez v. Barnhart, 372 F.3d 546, 553-55 (3d Cir. 2004); Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987); Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984). A hypothetical that omits limitations is defective, and the answer thereto cannot constitute substantial evidence to support denial of a claim. Id. However, "[w]e do not require an ALJ to submit to the vocational expert every impairment alleged by a claimant." Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) (emphasis in original). When an ALJ's hypothetical question to a vocational

49

expert sets forth the Plaintiff's limitations, as supported by the record, the

vocational expert's response may be accepted as substantial evidence in support of

the ALJ's determination that the Plaintiff is not disabled. See Chrupcala,

829 F.2d at 1276.

Furthermore, the administrative law judge has a duty to develop the record

and flesh out any inconsistencies. Social Security Regulation 00-4p states:

> Occupational evidence provided by a [VE] generally should be
> consistent with the occupational information supplied by the
> DOT. When there is an apparent unresolved conflict between
> [VE] evidence and the DOT, the adjudicator must elicit a
> reasonable explanation for the conflict before relying on the
> [VE] evidence to support a determination or decision about
> whether the claimant is disabled. At the hearings level, as part
> of the adjudicator's duty to fully develop the record, the
> adjudicator will inquire, on the record, as to whether or not
> there is such consistency.

SSR 00-4p, *2; SSR LEXIS 8, *4. Regarding an inconsistency between the DOT

and the sit/stand option at will as presented by the ALJ in the RFC, Judge Richard

P. Conaboy of this Court stated:

> In general terms, the VE's observation that these positions
> allow change of position at will, is appropriately viewed as a
> vocational expert's application of her expertise, her
> "knowledge, experience, and observations" in the words of the
> ALJ. [] Her reduction in the number of positions based on the
> conflict is similarly appropriate.
>
> Viewed in this context, the ALJ does not run afoul of SSR 00-

4p, 2000 SSR LEXIS 8 regarding [these] positions because he
was not presented with an "apparent unresolved conflict."
Rather, a fair reading of the colloquy here is that the ALJ was
presented with a conflict (made apparent by the VE's
testimony) and the VE resolved the conflict to the ALJ's
satisfaction in the course of her testimony.  In this context, the
ALJ would be under no obligation to elicit further testimony
from the VE on the sit/stand issue for the [positions] for which
the VE testified a reduction in numbers would be appropriate
based on this limitation. . . . Importantly, the ALJ
acknowledges in his decision that the VE's testimony is
inconsistent with the DOT. . .

<u>Minichino v. Colvin</u>, 955 F. Supp. 2d 366, 381 (M.D. Pa. 2013) (Conaboy, J.).

In the case at hand, the VE specifically stated, in response to the ALJ's

hypothetical, the following: ". . . as it is customarily performed in the average

workplace, a dispatcher does have a sit-stand option and it's sedentary; does not

require overhead reaching, and it doesn't require more than occasional postural

and does not typically expose anyone to the cold."  (Tr. 108). The VE also stated

that the RFC "was not inconsistent at all with the DOT, with the exception, of

course, of the sit-stand option . . ."  (Tr. 111).  The VE's response indicates that

she implicitly acknowledged that the relevant DOT sections were silent regarding

a sit/stand option.  (Tr. 108-111).  Additionally, the ALJ was aware of and

acknowledged the conflict because he stated that the VE's testimony was

consistent with the DOT with the exception of the sit/stand option, but that there

was a reasonable explanation for this discrepancy. (Tr. 50).

In accordance with the rationale above and the facts of this case, the conflict was implicitly acknowledged by the VE in his response to the hypotheticals, and was acknowledged and understood by the ALJ in arriving at his RFC determination. Therefore, it is determined that substantial evidence supports the ALJ's reliance on the VE's testimony because it included all the limitations discussed in the RFC determination and because there was no "apparent unresolved conflict" between the VE's testimony and the DOT in violation of SSR 00-4p.

As such, the ALJ's RFC determination and the VE's responses to the hypothetical are supported by substantial evidence, and these determinations will not be disturbed on appeal based on Plaintiff's assertions.

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be denied, the decision of the Commissioner will be affirmed, judgment will be entered in favor of Defendant and against Plaintiff, and the Clerk of Court will be directed to close this matter.

A separate Order will be issued.


**Date**: October 13, 2017

**/s/ William J. Nealon**
**United States District Judge**
